**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**



| | |
|---|---|
| PETER LASKARIS, on behalf of himself and all others similarly situated, | ) <br> ) <br> ) |
| Plaintiff, | ) **CLASS ACTION COMPLAINT** <br> ) |
| *vs.* | ) <br> ) **JURY TRIAL DEMANDED** |
| JPMORGAN CHASE & CO., J.P. MORGAN CLEARING CORP., J.P. MORGAN SECURITIES INC., J.P. MORGAN FUTURES INC., HSBC HOLDINGS PLC, HSBC SECURITIES (USA) INC., HSBC BANK USA, NATIONAL ASSOCIATION, and JOHN DOES 1-10 | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |
| Defendants. | ) <br> ) |

10 CIV 8157

Plaintiff complains of Defendants, on information[1] and belief as to all allegations except the allegations of Plaintiff's own conduct, which are based upon knowledge, as follows:

## SUMMARY OF ALLEGATIONS

1. **Unlawful conduct.**

a. Between in or about March 2008 and continuing through the present ("Class Period"), Defendants have combined, conspired and agreed to restrain trade in, fix, and manipulate

---

[1] Plaintiff's information includes: (a) reports of statements by Commodity Futures Trading Commission ("CFTC") Commissioner Bart Chilton that the silver market has been and is being manipulated; (b) public news reports about the investigation by the CFTC of manipulation in the silver market; (c) news reports of JP Morgan's recent decision to close its metals trading operation; (d) reports showing the recent reduction in the concentration of open interest in the silver futures contract held by commercial firms; (e) reports of silver and gold prices and silver futures and silver options prices; (f) reports of trading activity, open interest and other aspects of silver futures, and silver options trading; (g) webcasts and statements of the March 25, 2010 Meeting of the CFTC to Examine Futures and Options Trading in the Metals Markets; and (h) other public reports of the information alleged herein.

prices of silver futures and options contracts traded in this District on the Commodity Exchange Inc. ("COMEX") division of the New York Mercantile Exchange ("NYMEX") (which has now become a subsidiary of another company). Defendants thereby have violated Section 1 of the Sherman Act, 15 U.S.C § 1.

b.      Also during the Class Period, individual Defendants have intentionally acted to manipulate prices of COMEX silver futures and options contracts. Such conduct violates Section 9(a) of the Commodity Exchange Act, 7 U.S.C § 13b.

2.      **Purpose and Objective.** Defendants' collusive and individual unlawful behavior has primarily been intended to suppress prices of COMEX silver futures and to influence COMEX options accordingly: call options would generally decline and put options would generally increase in price. But such behavior also has been intended, at times, to maintain prices. This includes maintaining prices at levels at which options, including call option on silver futures contracts traded on the COMEX, would expire worthless ("options pinning").

3.      **Means**. (a) Defendants have effected their foregoing restraint of trade and manipulation through diverse means. These means themselves include lawful and unlawful acts.

(b) Defendants have held large positions in silver futures and silver options.

(c) Defendants have held a concentrated and substantial amount of the open interest in silver futures contracts.

(d) Defendants have made large trades at key times.

(e) Defendants or others have made large "spoof" orders which appeared on the trading screens; "spoofing" is the submission of a large order which is not executed but influences prices and is then withdrawn before it reasonably can be executed.

(f) Defendants have communicated with and/or signaled one another their trades.

2

4. **"During-After" Comparisons**. Prior to public complaints and the government investigation of manipulation of COMEX silver futures prices that began in March 2010, silver prices greatly underperformed gold prices. Since the government investigation began, silver prices have greatly outperformed gold prices.

5. This "price signature" is precisely consistent with what would be expected of very reputable firms (like the JP Morgan Group Defendants and the HSBC Group Defendants) when their unlawful activities are threatened by government investigations and possible exposure, and compliance intercedes.

    a. After public complaints and government reviews of those complaints about manipulation in the silver markets began in March 2010, Defendants somewhat changed their behavior. Among other things, Defendants (a) reduced the amount of their manipulative activities, (b) reduced the concentration of their holdings compared to the overall open interest in the silver futures market, and (c) the JP Morgan Group Defendants announced that they were ending its metals trading operation.

    b. As Defendants cut back on their unlawful activities, prices of silver futures traded on the COMEX dramatically increased. Such prices have increased by approximately 50% since March 2010 even though no fundamental changes in supply or demand for silver, including industrial demand, have occurred during this time period. Gold prices increased by only 20% during this time period.

    c. Likewise, between March 2008 and March 2010, the price of gold had similarly increased by approximately 20%. Rather than increasing by 50% as silver did while Defendants lessened their unlawful activity between March 2010 and the present, the

price of silver COMEX futures decreased by approximately 25% between March 2008 and March 2010.

d.      The foregoing "price signature" of manipulation is not explainable by any changes in supply and demand. These price changes directly result, at least in one substantial part, from Defendants' reduction in their concentration and other reductions of their other unlawful activities in the silver markets since the government investigation of the public complaints about manipulation began in March 2010.

6.      As a direct result of Defendants' unlawful conduct alleged herein, Plaintiff and members of the Class have been injured in their property and damaged by transacting in the artificial market that has existed for COMEX silver futures and options contracts.

## JURISDICTION AND VENUE

7.      Silver is a "commodity" and is the "commodity underlying" silver futures and options contracts traded on the COMEX, as those terms are defined and used in Section 1a(4) and 22 of the CEA, 7 U.S.C. §§ 1a(4) and 25(a)(1)(D), respectively.

8.      This action arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, and Section 22 of the CEA, 7 U.S.C. § 25.

9.      This Court has jurisdiction under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, Section 22 of the CEA, 7 U.S.C. 25, and 28 U.S.C. §§ 1331 and 1337.

10.      Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a), pursuant to Section 22 of the CEA, 7 U.S.C. § 25, and 28 U.S.C. § 1391(b), (c) and (d). The Defendants transacted business in the Southern District of New York, the claims arose in the Southern District of New York, and a substantial part of the events or omissions giving rise to the claims occurred in the Southern District of New York. Defendants' unlawful acts manipulated the

prices of COMEX silver (sometimes, "silver") contracts which were traded in this district in which COMEX is located, at One North End Avenue, New York, New York. As used herein, COMEX silver contracts means COMEX silver futures contracts, and COMEX options on such contracts.

11.　Defendants made use of the means and instrumentalities of transportation or communication in, or the instrumentalities of, interstate commerce, or of the mails in connection with the unlawful acts and practices and courses of business alleged in this Complaint.

## PARTIES

12.　Plaintiff Peter Laskaris is a resident of New York. During the Class Period, Plaintiff Laskaris transacted in COMEX silver futures and options contracts and was injured in his property as a result of Defendants' unlawful conduct. This includes during June 2008-June 2009 when Plaintiff Laskaris's COMEX silver option trading was damaged by the artificial market in COMEX silver futures.

13.　Defendant JPMorgan Chase & Co. is a Delaware financial holding company with its principal place of business in New York, New York. JPMorgan Chase & Co. is a leading global financial services firm and one of the largest banking institutions in the United States with $2.1 trillion in assets, $164.7 billion in stockholders' equity, and operations in more than 60 countries.

14.　Defendant J.P. Morgan Clearing Corp. ("JPMC"), formerly known as Bear, Stearns Securities Corp. is a Delaware corporation with its corporate offices in Brooklyn, New York. JPMC is a subsidiary of J.P. Morgan Securities Inc. which is a wholly owned subsidiary of JPMorgan Chase & Co. JPMC is a registered Futures Commission Merchant with the CFTC.

15.    Defendant J.P. Morgan Securities Inc. ("JPMS") is a Delaware corporation with its principal place of business in New York, New York.  JPMS is a wholly owned subsidiary of JPMorgan Chase & Co.  JPMS, through JPMC, provides securities and futures clearing, customer financing, securities lending and related services.

16.    Defendant J.P. Morgan Futures Inc. ("JPMFI") is a Delaware corporation with its principal place of business in New York, New York.  JPMFI is a U.S. futures commission merchant and wholly owned subsidiary of JPMorgan Chase & Co.  JPMFI provides research, sales, execution and clearing services in futures and options across fixed income, equity, foreign exchange and commodity asset classes.  JPMFI holds the U.S. accounts of JPMorgan Chase's global futures and options business customers.

17.    Defendant HSBC Holdings plc ("HSBC Holdings") is a United Kingdom public limited company with its corporate headquarters in London, England.  As of 2009, HSBC Holdings was the world's largest banking group and the world's sixth largest company according to Forbes Magazine.

18.    Defendant HSBC Securities (USA) Inc. ("HSBC USA") is a Delaware corporation with a corporate office located in New York, New York.  HSBC USA is a wholly owned subsidiary of HSBC Markets (USA) Inc. whose ultimate parent is HSBC Holdings plc.  HSBC USA is a registered broker-dealer of securities under the Securities Exchange Act of 1934 and is a registered Futures Commission Merchant with the CFTC.

19.    Defendant HSBC Bank USA, National Association ("HSBC NA") is a Texas company with an office in Wilmington, Delaware.

20.    John Doe Defendants 1-10 are persons, whose identities are presently unknown to Plaintiff, who performed, participated in, furthered, and/or combined conspired or agreed with

others to perform the unlawful act alleged herein, including the restraint of trade, fixing of prices, and manipulation of silver futures and silver options traded on the COMEX.

21.    As used herein, Defendants refers to the John Doe Defendants, JP Morgan Group Defendants, and the HSBC Group Defendants.

a.    As used herein, JPMorgan Chase & Co., J.P. Morgan Clearing Corp., J.P. Morgan Securities Inc. and J.P. Morgan Futures Inc. are sometimes referred to as the J.P. Morgan Group Defendants.

b.    As used herein, HSBC Holdings plc, HSBC Securities (USA) Inc. and HSBC Bank USA, National Association are referred to as the HSBC Group Defendants.

## FACTUAL ALLEGATIONS

### I.    Background

22.    Wholly unlike the securities markets, in the commodity futures market (a) more than 99% of the contracts do not result in delivery and may remain open for multi-month periods with no delivery of the commodity, and (b) at any given time, one-half of the participants in the futures market are "short" and one-half of the participants are the buyers of a contract or "long".

### A.    Overview of COMEX Silver Futures and Options Contracts

23.    Silver futures contracts and silver options contracts are traded on COMEX.

24.    COMEX, a division of the New York Mercantile Exchange ("NYMEX"), has been designated by the CFTC as a contract market pursuant to Section 5 of the CEA, 7 U.S.C. § 7. COMEX submits to the CFTC various rules and regulations for approval through which COMEX designs, creates the terms of, and conducts trading in various precious metals futures and options contracts, including futures and options contracts for silver. COMEX is an

organized, centralized market that provides a forum for trading silver futures and options contracts.

25.     COMEX provides standardized silver futures contracts with delivery dates commencing with the next calendar month and potentially extending as far as 60 sequential months into the future depending upon the month in which the contract was executed. A silver futures contract is an agreement to buy or sell a fixed amount of silver at a date in the future. The COMEX specifies the terms of trading, including the trading units, price quotation, trading hours, trading months, minimum and maximum price fluctuations and margin requirements.

26.     Trades of silver futures contracts on the COMEX have two "sides." The "long" side represents the buyer of a contract who is obligated to pay for the silver and take delivery. The "short" side represents the seller of a contract who is obligated to receive payment for the silver and make delivery. If a market participant holds its position to the end of the settlement period for a silver futures contract, the market participant is obligated to "go to delivery." That is to say, upon the settlement date, the "futures" contract for a particular month becomes a present contractual obligation for the purchase and sale of the physical silver. Longs must take delivery and shorts must make delivery of 5,000 troy ounces per contract over the course of the contract month. The price for the silver that goes to delivery is the "settlement price" of the COMEX silver futures contract.

27.     Only a small percentage of all futures contracts traded each year on COMEX and other exchanges result in actual delivery of the underlying commodities. Instead, traders generally offset their futures positions before their contracts mature. For example, a purchaser of a silver futures contract can cancel or offset his future obligation to the contract market/exchange clearing house to take delivery of silver by selling an offsetting futures contract. The difference

between the initial purchase or sale price and the price of the offsetting transaction represents the realized profit or loss.

**B.**     **Short Option Positions**

28.     There are a number of ways to "go short," i.e., bet that the price of silver will decrease. As discussed above, one can sell a futures contract which confers upon the seller an obligation to deliver silver at a pre-specified date in the future at a pre-specified price. Alternatively, one can sell call options, which confers upon the buyer of the call option the right, but not the obligation, to purchase silver from the seller at a pre-specified "strike price" at some date in the future (i.e., expiry). At expiry, if the price of silver exceeds the strike price, the buyer will exercise the option, which means the seller will pay the difference between the prevailing price and the strike price. Conversely, if the price of silver falls short of the strike price, the option expires "out of the money."

29.     In the cases above (or any other method in which an entity creates a short position), the entity that is short benefits as prices fall. In the case of selling a futures contract, the seller at time of contract expiration simply offsets his position by purchasing a futures contract and pockets the difference in prices. In the case of a call option, the seller benefits if the prevailing price is below the strike price because it collects the option premium and pays nothing to the purchaser.

30.     Upon information and belief, during the Class Period, Defendants had net short positions in silver options contracts, including but not limited to, the sale of call options.

**C.**     **Physical and Futures Prices for the Underlying Physical Commodity are Directly Related to One Another**

31.     The futures price is the market's consensus of the expected spot price for the underlying physical commodity at a specified future date. Because the futures price is nothing

more than an expectation of the future spot price, both futures and physical prices must be and are, in fact, correlated. For example, if the futures price in a contract negotiated today for delivery next month starts to rise, this indicates that the market believes spot prices will rise next month. The rise in the future price for next month delivery will cause a reaction today among producers and consumers of the commodity.

32.     For the producers of the commodity, the increase in the price of that commodity for delivery next month makes it more profitable to shift sales from the current month to the next month. Conversely, for buyers of physical silver, the increase in price for delivery next month creates an incentive for them to purchase today rather than waiting until next month when the price increase is expected. Thus, the increase today in futures price (for delivery next month) has caused producers to decrease the available supply of the commodity and prompted buyers of physical silver to increase their demand. The decrease in supply coupled with the increase in demand, causes today's spot prices for the commodity to increase. The same causal economic story (albeit in reverse) prevails if futures prices decline.

33.     Therefore, changes in futures prices for delivery months into the future have tangible effects on physical spot prices today. Put statistically, futures prices and physical spot prices are linked and correlated.

II.     **Through Their Enormously Concentrated Short Positions, Defendants Had the Power to and Did Suppress COMEX Silver Futures and Option Contract Prices**

A.     **The COMEX Silver Futures and Options Contracts Market is Susceptible to Collusion**

34.     The silver futures market is a thin market. The number of futures contracts traded in the silver market is small, i.e., thin, in comparison to markets involving other commodities. For instance, in August 2008, there were only 129,240 open interest silver futures contracts, i.e., silver futures contracts that had not yet settled, as opposed to 1.25 million open interest NYMEX

Light Sweet Crude Oil futures contracts and 408,430 open interest COMEX gold futures contracts during the same period.

35.     The relatively sparse number of silver futures contracts regularly traded on COMEX enabled large banks, such as Defendants, to manipulate the price of silver futures contracts during the Class Period by flooding the market with a disproportionate number of contracts.

36.     In addition, the market for COMEX silver futures and options contracts is highly concentrated with only a handful of very large banks controlling a dominant number of futures and options contracts.

37.     In August 2008, subsequent to JPMorgan's acquisition of Bear Stearns, Defendants JPMorgan and HSBC controlled over 85% of the commercial net short position in COMEX silver futures contracts and 25% of all open interest short positions.

38.     In the first quarter 2009, HSBC NA held 40% of all precious metals derivatives (excluding gold) held by commercial banks.

39.     As of the first quarter 2009, Defendants owned more than 96 percent of all precious metal derivatives held by U.S. banks (excluding gold) with a combined notional value of $7.9 billion.[2]

40.     Prices in the silver futures and options market respond much more to large orders, large trades, and large positions than do prices in other commodity markets.

---

[2]     The "notional value" is the value of a derivative's underlying asset as determined by the asset's spot price. In the case of an options or futures contract, the notional value is the number of units of the asset underlying the contract multiplied by the spot price of the asset.

**B.**     **Substantive Allegations**

41.     A review of the Office of Comptroller of the Currency's Quarterly Report on Bank Derivatives Activities for the first quarter of 2009, which provides information on the value of derivative contracts for the top five commercial banks and trust companies, indicates that, together, JPMorgan and HSBC controlled 96% of all precious metals derivative contracts besides gold (which include silver).

42.     In March 2008, JPMorgan purchased Bear Stearns. Bear Stearns had amassed a significant short position in silver contracts.

43.     By August 5, 2008, Defendants were short a massive 33,805 contracts, or more than 169 million troy ounces of silver. This short position was equal to an approximately 25% of annual world mine production of silver.

44.     Defendants consistently maintained their massive short positions until March 2010 when the public complaints about manipulation began.

45.     According to publicly available information, JP Morgan traders bragged during the Class Period about their large trades which successfully moved silver prices.

46.     Also during the Class Period, the trading of silver futures and options indicates that large "spoofing" orders were entered and that options pinning occurred.

47.     According to publicly available information, JPMorgan Group Defendants sent "signals" to HSBC Group Defendants and other Defendants coordinating Defendants' collusive restraint of trade, fixing, and manipulation of the prices of COMEX silver futures and options contracts.

48.     According to publicly available information, such "signals" were sent, among other times, on a monthly basis on or around the dates of certain key events, including: (a)

12

following the United States Department of Labor's issuance of Non-Farm Payroll Reports[3], which are released during the first week of each month; (b) at the time of Options Expiry[4] on the last four business days of each month; and (c) during COMEX silver futures contract roll-over.[5]

49.    Further according to publicly available information, manipulative trades and orders have repeatedly been entered prior to the opening of trading COMEX silver futures.

50.    According to publicly available information, the JP Morgan Group Defendants and the HSBC Group Defendants were among the Defendants who engaged in the forgoing manipulative practices.

51.    According to an October 27, 2010 article published in the Wall Street Journal, The CFTC's enforcement staff has circulated a packet of information to CFTC lawyers and commissioners, outlining some of its findings in the silver probe, including documents that could suggest there have been attempts to manipulate prices.

52.    According to the same article, CFTC lawyers have interviewed employees of JPMorgan in its metals-trading business as well as industry traders, commodity executives, experts and employees of other metals-trading firms.

---

[3]    The Non-farm Payroll Report is an influential statistic and economic indicator released monthly by the United States Department of Labor as part of a comprehensive report on the state of the labor market.

[4]    The expiration date of an options contract, a.k.a., Options Expiry, is the day on which an options contract is no longer valid and, therefore, ceases to exist. Because Defendants held net short positions in silver options contracts, Defendants profited by driving down the price of COMEX silver futures contracts. Indeed, by depressing the price of COMEX silver futures contracts, Defendants assured themselves that the long options contracts opposite their positions would expire out of the money. Since the options expired worthless, traders who owned the positions opposite to Defendants did not exercise their options and Defendants reaped a profit.

[5]    Contract rollover occurs each month when a futures contract holder exchanges (rolls over) an expiring contract position for a contract position which expires at a later date.

## III. Other Factors Indicating a Conspiracy

### A. Standardized Product with High Degree of Interchangeability

53.     When products offered are viewed as interchangeable by market participants, it is easier to unlawfully agree on the price for the product in question, and it is easier to effectively monitor agreed-upon prices. This makes it easier to form and sustain an unlawful anticompetitive agreement or conspiracy.

54.     Here, COMEX silver futures and options contracts are interchangeable. Indeed, the COMEX specifies the terms of each contract, including the trading units, price quotation, trading hours, trading months, minimum and maximum price fluctuations and margin requirements.

### B. Defendants Had the Opportunity to Conspire Through Their Participation in Trade Associations

55.     Participation in trade associations can foster and facilitate an unlawful anticompetitive conspiracy. Throughout the Class Period, Defendants participated in numerous trade association activities and events together, which provided many opportunities to conspire and share confidential information and trading strategy.

56.     For example, Defendants are members of the Futures Industry Association (FIA"), the Futures and Options Association ("FOA") and the London Bullion Market Association ("LBMA").

57.     HSBC USA and JPMFI are regular members of the FIA, a United States-based industry advocacy and education organization whose regular members are all futures commission merchants. In addition, the FIA's board of directors includes the managing director and global co-head of JPFMI's futures and options and OTC clearing, and Robert T. Cox, the managing director and head of futures of HSBC USA. Richard Berliand, the chairman of JP

Morgan Futures and Options and head of JP Morgan-Bear Stearns' prime brokerage business, serves as a special advisor to the board. As part of FIA, Defendants participate in the annual Futures & Options Expo, the FIA/OIC Investor Education Day, the International Derivatives Expo, and other events and meetings.

58. HSBC Bank PLC and JPMS are members of the FOA, an industry association for firms and institutions carrying on business in futures, options and other derivatives or which use such products in their business. FOA's principal role is to represent the interests of its members in the public and regulatory domain and deliver a wide range of support services to the membership. Defendants participate in annual events and conferences such as International Derivatives Week. In addition, Richard Berliand of JPMFI serves as a special advisor to FOA's Board.

59. Both JP Morgan Chase and HSBC NA are also members of the LBMA, the London-based trade association that represents the wholesale gold and silver bullion market in London.

**C.  In Order To Manipulate Public Market Prices, Collusion Is Very Helpful**

60. Each of the Defendants would have been more likely to take short positions if it knew beforehand and was confident that the other Defendant were supporting it and taking similar steps in order to control the public market prices. Absent their collusion, signaling and prior knowledge, it would be much less likely to be in each of the Defendant's independent economic self-interest to engage in the activities alleged here.

61. However, large traders have repeatedly manipulated commodity futures markets on their own without collusion in the past, this is true even, though non-collusive activity this is not the safest form of manipulation.

**D.** **Absent an Unlawful Conspiracy to Suppress and Manipulate the Price of COMEX Silver Futures and Options Contracts, Defendants' Actions Were Contrary to Their Economic Self-Interest**

62.     Each of the Defendants would have been more likely to have taken or maintained their enormous short positions if it knew beforehand and was confident that the other Defendant would support it and take similar short positions in the market for COMEX silver futures and options contracts. Absent their collusion, signaling and prior knowledge, it would be less in each of the Defendant's independent economic self-interest to take such enormous short positions.

## FRAUDULENT CONCEALMENT

63.     By its very nature, the unlawful activity, as alleged herein, that Defendants engaged in was self concealing. Defendants, inter alia, conspired and engaged in secret and surreptitious activities in order to manipulate and make artificial prices for COMEX silver futures and options contracts.

64.     Defendants fraudulently concealed their participation in their conspiracy to manipulate and make artificial the market for COMEX silver futures and options contracts by, among other things, engaging in secret "signals" or communications in furtherance of the conspiracies. Because of such fraudulent concealment, and the fact that a conspiracy in restraint of trade is inherently self-concealing, Plaintiff and the members of the Class could not have discovered the existence of Defendants' conspiracy and manipulation any earlier than public disclosures thereof.

65.     The JP Morgan Group Defendants and the HSBC Group Defendants are or were very reputable firms. None of the facts or information available to Plaintiff and members of the Class prior to October 26, 2010, if investigated with reasonable diligence, could or would have led to the discovery of the conspiracies alleged in this Complaint.

16

66.     Because Defendants employed acts and techniques that were calculated to wrongfully conceal the existence of such illegal conduct, Plaintiff and the Class could not have discovered the existence of this unlawful conduct any earlier than its public disclosure in or about October 26, 2010.

67.     As a result, Plaintiff and members of the Class were prevented from learning of the facts needed to commence suit against Defendants for the manipulative and anticompetitive conduct alleged in this Complaint until October 26, 2010.

68.     Defendants are equitably estopped from asserting that any otherwise applicable limitations period has run.

## DEFENDANTS' ANTITRUST VIOLATIONS

69.     Beginning in approximately March 2008, and continuing until at least through today, the exact dates being unknown to Plaintiff, Defendants and their co-conspirators engaged in a continuing agreement, understanding, or conspiracy in restraint of trade to artificially fix, maintain, suppress, and/or stabilize the prices of COMEX silver futures and options contracts.

70.     In formulating and effectuating the contract, combination, or conspiracy, Defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to restrain trade in, fix or manipulate prices of COMEX silver futures and options contracts.  These activities included the following:

(a)     Defendants participated in "signals", meetings and/or conversations to unlawfully discuss the price of COMEX silver futures and options contracts;

(b)     Defendants agreed through these "signals", meetings or conversations to unlawfully work to drive down the price of COMEX silver futures contracts, prevent such prices

from increasing, or to otherwise collusively make artificial the prices of COMEX silver futures and options;

      (c)      Defendants held large positions in the markets;

      (d)      Defendants made large trades;

      (e)      Defendants entered large orders;

      (f)      Defendants otherwise knowingly and collusively acted in order to restrain trade.

## ALLEGATIONS OF ANTITRUST
## INJURY TO PLAINTIFF AND THE CLASS

71.    Defendants' restraint of trade and anticompetitive conduct had severe adverse consequences on competition and price discovery. Plaintiff and other members of the Class who traded COMEX silver futures and options contracts during the Class Period were deprived of normal, competitive trading patterns and instead subject to artificially determined prices as a result of Defendants' unlawful conduct. As a consequence thereof, Plaintiff and the Class suffered financial losses and were, therefore, injured in their business or property.

## CLASS ACTION ALLEGATIONS

72.    Plaintiff brings this action as a class action under Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of himself and others similarly situated. The "Class" is defined as:

> All persons or entities other than Defendants and their employees, affiliates, parents, subsidiaries or co-conspirators (whether or not named in this Complaint) who transacted in COMEX silver futures or options contracts between March 1, 2008 through such time as the effects of Defendants' illegal conduct ceased.

73.     The Class is so numerous that joinder of all members is impracticable. While the exact number of the Class members is unknown to Plaintiff at this time, Plaintiff is informed and believes that at least thousands of geographically dispersed Class members traded COMEX silver futures and options contracts during the Class Period.

74.     Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and members of the Class sustained damages arising out of Defendants' common course of conduct in violation of law as complained herein. The injuries and damages of each member of the Class were directly caused by Defendants' wrongful conduct in violation of law as alleged herein.

75.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action litigation, including commodity manipulation and antitrust class action litigation.

76.     Common questions of law and fact exist as to all members of the Class which predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether Defendants conspired with others to artificially depress and manipulate the price of COMEX silver futures and options contracts in violation of the Sherman Act;

(b)     Whether Defendants' conduct, which manipulated and suppressed the prices of COMEX silver futures and options contracts, violates the CEA;

(c)     Whether Defendants' conduct had an anticompetitive and manipulative effect on the prices of COMEX silver futures and options contracts purchased or sold by Plaintiff and the Class during the Class Period; and

(d)     The appropriate measure of damages, under the CEA and federal antitrust laws, sustained by Plaintiff and other members of the Class as a result of Defendants' unlawful activities.

77.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable.  The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and Defendants, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class.  A class action, on the other hand, would achieve substantial economies of time, effort and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

78.     The interest of members of the Class in individually controlling the prosecution of separate actions is theoretical rather than practical.  The Class has a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable.  The amounts at stake for Class members, while substantial in the aggregate, are not great enough individually to enable them to maintain separate suits against Defendants.  Plaintiff does not anticipate any difficulty in the management of this action as a class action.

**COUNT ONE**

**VIOLATION OF COMMODITY EXCHANGE ACT, 7 U.S.C. § 1**

79.     Plaintiff incorporates by reference the preceding allegations.

80.     Plaintiff and members of the Class sold COMEX silver futures contracts and/or purchased or sold options contracts during the Class Period at prices which were made artificial by Defendants' unlawful activities, and were injured as a result of Defendants' manipulation and suppression of the prices of those contracts.

81.     Defendants' activities constitute manipulation of the prices of COMEX silver futures and options contracts during the Class Period in violation of Sections 9(a) and 22(a) of the CEA, 7 U.S.C. §§ 13(a), 25(a).

82.     Defendants are liable to Plaintiff and members of the Class for the damages they sustained as a result of their CEA violations.

## COUNT TWO

### AIDING AND ABETTING VIOLATIONS OF COMMODITY EXCHANGE ACT, 7 U.S.C. § 25

83.     Plaintiff incorporates by reference the preceding allegations.

84.     Defendants knowingly aided, abetted, counseled, induced, and/or procured the violations of the CEA alleged herein. Defendants did so knowing of each other's manipulation and suppression of COMEX silver futures and options contract prices, and willfully intended to assist these manipulations to unlawfully cause the price of COMEX silver futures and options contracts to be suppressed or to otherwise reach artificial levels during the Class Period, in violation of Section 22(a)(1) of the CEA, 7 U.S.C. § 25(a)(1).

85.     Defendants are liable to Plaintiff and the Class for the damages they sustained as a result of the CEA violations.

## COUNT THREE

### VIOLATIONS OF SECTION 1 OF THE SHERMAN ACT

86.     Plaintiff incorporates by reference the preceding allegations.

87.     Defendants entered into and engaged in a conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act.

88.     During the Class Period, Defendants possessed market power in the market for the sale of COMEX silver futures contracts.

89. The conspiracy consisted of a continuing agreement, understanding or concerted action between and among Defendants and their co-conspirators in furtherance of which Defendants fixed, maintained, suppressed and/or made artificial prices for COMEX silver futures and options contracts. Defendants' conspiracy is a per se violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

90. Defendants' conspiracy, and resulting impact on the market for COMEX silver futures and options contracts, occurred in or affected interstate and international commerce.

91. As a proximate result of Defendants' unlawful conduct, Plaintiff and members of the Class have suffered injury to their business or property.

92. Plaintiff and members of the Class are each entitled to treble damages for the violations of the Sherman Act alleged herein.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief as follows:

(A) For an order certifying this lawsuit as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, and designating Plaintiff as the Class representative and his counsel as Class counsel;

(B) For a judgment awarding Plaintiff and the Class damages against Defendants for their violations of the CEA, together with prejudgment interest at the maximum rate allowable by law;

(C) For a judgment awarding Plaintiff and the Class any and all sums of Defendants' unjust enrichment;

(D)     For an order impressing a constructive trust temporarily, preliminarily, permanently or otherwise on Defendants' unjust enrichment, including the portions thereof that were obtained at the expense of Plaintiff and the Class;

(E)     For an award to Plaintiff and the Class of their costs of suit, including reasonable attorneys' and experts' fees and expenses; and

(F)     For such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff respectfully demands a trial by jury.

Dated: New York, New York
       October 27, 2010

LOVELL STEWART HALEBIAN
JACOBSON LLP

By: _____
Christopher Lovell (CL 2595)
Ian T. Stoll (IS 3424)
Christopher M. McGrath (CM 4983)
Benjamin M. Jaccarino (BJ 1273)
61 Broadway, Suite 501
New York, New York 10006
(212) 608-1900
(212) 719-4677 (fax)

*Counsel for Plaintiff and the
Proposed Class*